Case 24-5932 United States of America v. Erik Maund, et al. Argument not to exceed 10 minutes for each defendant and 30 minutes for the plaintiff. Counsel, you may proceed for the appellant when ready. Good morning, Your Honors. I reserve five minutes for rebuttal. May it please the court, Nick Golden on behalf of the United States. This was a two-week trial, including more than 250 exhibits, about 25 witnesses. In particular, the jury heard highly incriminating statements made by all three defendants on recordings. The district court concluded that because the jury heard one unadmitted statement and did not hear another unadmitted statement, the combined effect of those two statements was unquantifiable and therefore structural error. The district court thus granted a new trial to all three defendants, including Defendant Carey, who got the exact result in the district court that he asked for. That conclusion was wrong and this court should reverse. I'd like to start with the district court's determination that this was structural error as opposed to trial error, and that conclusion was incorrect for two pretty straightforward reasons. The first is this court's precedent. In at least two published cases, I'm thinking of Nevers versus Killinger and Doan versus Bergano, this court has held that when extraneous information reaches the jury, that is a trial error that is amenable to harmless error analysis. Does it make a difference if the court is responsible for providing that extraneous information? It does not, Your Honor. When we're talking about whether something is structural error or trial error, something is structural structural error only if it affects the whole framework in which the trial proceeds. And to determine whether an error is of that type, we're specifically looking at whether the effects are quantifiable. Whether the information reaches the jury from the court or like in a more typical Remmer case where maybe the jury, a juror goes outside of the courtroom and learns some information and brings it back in. In either case, we're asking, is it quantifiable? And so the source of the information doesn't affect whether it's quantifiable. How do you decide whether something is quantifiable? In this particular case, we're only talking about two statements, Your Honor, so I would I would submit that this is an easy case. I mean, it isn't you count two versus a hundred or something like that, right? Wouldn't you need to look at the weight of the statements? That may be correct, Your Honor. I mean, I think that was something of the Ninth Circuit's reasoning in NUSHVAR, which is the case that they rely on heavily there. It was a really large quantity of recordings. At issue that will be quantifiable. I mean, it seems to me that would you argue that the Ninth Circuit's wrong? I mean, that every type of trial error in some form is quantifiable, whereas all the structural errors the Supreme Court's ever pointed to, right, to pick counsel if you're choosing public press, those types of things seem outside of it. Yes, Judge Tapar, we do think that NUSHVAR, probably if it was decided today, would just be a case of harmful error. It wouldn't be a structural error. I think that case kind of predated a lot of the Supreme Court's more recent clarification about how we distinguish trial errors and structural errors. What do you do with Sullivan? The Sullivan interview in Louisiana, the Supreme Court case about not giving a reasonable doubt instruction. Well, I think Sullivan, I think, was clarified to a considerable extent by Nieder. I think Nieder kind of reframed the analysis. But I don't think that Sullivan would be a problem for us in any event. The jury hearing one statement and not hearing another. Nieder authored Sullivan and then dissented in Nieder and said Nieder should have gone the other way, so I get what you're saying, and it's a fair argument, but why shouldn't we look at that, I mean, in some form and try and figure out what's going on? I'm not sure. Are you saying, okay, so you're saying the reasonable doubt instruction itself, that seems like part of the trial process, and I agree with you post-Nieder, we can look at the record as a whole to determine if someone's guilty. But those two cases I struggle with in that they seem in direct conflict. I agree with your honor to some extent. I think they are in conflict. But I don't think that Sullivan is a, even if the court were to take Sullivan, you know, as a given, it's not a problem here because giving a jury a defective reasonable doubt instruction, that just affects the whole framework of the trial. All the evidence that comes in, if the jury is evaluating it under the wrong standard, that's very different from an error in considering, you know, one piece of evidence that shouldn't have been or one that, or even if it's a lot of evidence, it's just fundamentally different. And you made the point earlier that with respect to one of the defendants, Kerry, the defendant got exactly what he wanted with this evidence coming in, and he had wanted it to come in, but he had not pushed for it to come in because there were going to be consequences in terms of other evidence coming in, and that that didn't happen. So what about the other two defendants, though? So with respect to defendants Mond and Brockway, is Your Honor asking, are we moving to whether it's harmless beyond a reasonable doubt? That would be the question. Yes. Why isn't it harmful vis-a-vis them? So if we don't call it structural error and say we do a harmless error analysis, why isn't it harmful? I think it's helpful to go statement by statement here. So the first statement, take the statement that the jury didn't hear, that's Kerry's statement at this July 2020 lunch where he said that no one cares about those two people referring to the victims. With respect to Mond and Brockway, it's true that at trial they did, one of their defenses that they argued was that Kerry was kind of a loose cannon who went rogue and committed these murders without Mond and Brockway's knowledge or agreement, but that statement that no one cares about those two people, while it is certainly a callous statement that maybe reflects poorly on Mr. Kerry, it does not, it's not significant to the argument that they were trying to advance a trial, that he was a loose cannon and did this without their knowledge. Whether he said that or not, their knowledge and agreement, I'm talking about Mond and Brockway, was established by other evidence and they were able to make that argument at trial and they did make it at trial if you look at opening and closing statements. I'm curious about this whole burden question, and it seems like your position here is that you're embracing this tougher standard for the government, and I'm wondering, as I understand it from the briefing and the cases I've read, that's not necessarily what our court has said in the past. That's right, Your Honor. Help me square that. This court has consistently held, I think since Pinnell in the kind of the mid-80s, has held that Smith v. Phillips did put the burden on the defendant to prove actual prejudice. Were we bound by that? Well, I mean, we have offered to accept the more difficult burden of proving it was harmless beyond a reasonable doubt, and I'll explain to the court why. As we kind of set out in the reply brief and in our opening brief, the error here could be viewed as touching on prudent issues, which, of course, if that were the case, then it would have to be evaluated under the Chapman, you know, beyond a reasonable doubt, harmlessness standard. The error also could simply be viewed as like an ordinary evidentiary error. Some evidence came in... I don't think Kerry knew nothing about it being prudent. Your Honor, to be clear, I don't think it is, and I don't think it's testimonial for one thing. You can go back to answering Judge Ritt's question. I'm sorry to interrupt. And if this were conceived of as an ordinary evidentiary error, it would be subject to the Kotiakos harmless error standard. And then, as Your Honor pointed out, we have a third standard in play, which is this Court's Vremer standard. But under any of those standards, because the statements at issue were insignificant in the context of the trial, and the evidence of guilt was overwhelming, the government would prevail. So to kind of help the court cut through a lot of that, we've offered to take on... I guess, assume maybe we don't agree with that, and assume, you know, that I think the standard matters, and that if you have the standard to show harmlessness beyond a reasonable doubt, you can't satisfy it. But if it's the defendant's burden, then maybe you do win. I mean, I'm just trying to struggle with... I mean, easy for you guys to say no matter what standard we win, but, you know, the situation where we don't necessarily agree with that, are we bound by these prior cases, or do we take your concession? I think there is some limits to the ability of the court to reject a concession. But, I mean, I think it's one question. It's kind of, was there prejudice here? Is that right? So we can apply the wrong law if the government concedes? Like, if we have law that says, A, our case law says we have an independent obligation to get the law right no matter what the parties do. You're saying the government can concede, and then we can apply the wrong law? Or are you saying we're gonna presume the defendant has shown that the error meets the, whatever the penal standard is, slash Smith standard, and we accept that, and so the burden shifts to us to show it's harmless beyond a reasonable doubt. I think, if your honor, I think that would be another way to think about it. Yeah, so we can't get the law wrong, but we can accept that you concede the defendants can meet their part of this burden, whatever it is under Penal Smith. Yeah, I think the court could assume that for purposes of this analysis. If we decide it's not structural, and so therefore some iteration of this harmlessness, you know, whoever has the burden, inquiry is appropriate, should we be doing that, or should we be sending it back to the district court? You certainly can do it, and we're asking you to do it, and let me explain why. A few reasons. The first is that the district court has already said that it views this error as not capable. You'd lose if we send it back. Well, no, I think that the court could, I think that if the court explains that it is quantifiable, and and there's, you know, explains how it would be quantified, I think we would argue that in the district court, we wouldn't necessarily lose. But I think that given the district court has already explained that it struggles with the quantification analysis here, we think it makes sense for this court to do the analysis, particularly given that this court is very familiar with harmlessness. And the district court can follow our instructions. Do they have inherent benefits, or could we look at the same record and come to the same conclusion? In other words, is there any advantage to the district court doing the analysis in the first instance, because we're always going to be the backstop. I don't, I don't think there's much advantage, if any, in this case. And I say that because the one thing that some of the defendants mentioned in their briefing as well, that the district court was at the Remmer hearing, and so is familiar with that. We don't think that familiarity with the testimony at the Remmer hearing is important here, because we've, the district court found that the whole jury was likely exposed to Carey's Exhibit 3, which is the recording, and we're not challenging that. So you can assume exposure. And then the question is, is the district court's greater familiarity with the trial beneficial? And what I would say about that is that the most, the most probative evidence of guilt here is the recorded statements that this court can listen to. And in particular, I'm thinking of Government's Exhibit 120 with respect to Mond, which is, that's a recorded phone call between Mond and Gilad Peled, which happens right, shortly after Peled is arrested. And in that recorded call, Peled comes to Mond with a ruse, saying that one of the, one of the Nashville shooters is back, has found out that Mond was the client who paid for the job, and is seeking more money. And Mond responds to that by saying he wants to take care of it permanently, and he'll, he'll run $150,000 through Speartip like last time. And that's very significant, because the trial evidence showed that before the murders in this case, Mond paid $150,000 to Peled earlier that day through his company Speartip. Can I ask you one question, which is, is there any situation where it makes sense to, for example, decide it as to carry, but not to Mond and Brockway? Yeah, I mean, we have, we have, we have asked that if nothing else, that this court does decide it as to carry, because that is the easiest part of this case, and the court could do that. We're asking, we think the court should decide it as to all three, but the court could just decide it as to carry. And it would be the same record. We'd be looking at the same record that if, you know, that the district court would be looking at if we sent it back. Absolutely, and I think that's another point, is the judicial economy here, this, as your Honor just suggested, this court has the record, it can make the decision now, and if it, if it doesn't make the decision now, this, this issue is probably just going to be back in this court at a later date. Would that be on, I'm sorry, on an abuse of discretion standard? If we sent it back, court rules comes back? I think, I think your Honor is correct about that, yes. So the district judge said it wasn't quantifiable, and that's why he called it structural error. If we say it is quantifiable, what kind of instructions should we give, if we were to think about remanding, that would, that would make it clear to the district judge? I think one, one thing that might be helpful is the district court was very concerned about this statement that the jury didn't hear. That was a large part of the reason why the district court thought it wasn't quantifiable, because the district court concluded that it's, you know, kind of impossible to assess the effects of something that, that didn't happen. I think this, this court could say two things about that. First, under Supreme Court precedent, evidence that a jury doesn't hear can still be evaluated under a harmless error analysis. And the case we cited for that is Delaware versus Van Arsdale, where the Supreme Court said that, you know, even if a defendant is improperly precluded from cross-examining a witness on bias, you can still, you can still do the harmless error analysis and figure out what the effect of that cross-examination testimony would have been, if it had been permitted. The other thing I would say is that I'm not sure that the effect of a statement the jury didn't hear even comes in, should come into play here. We're talking about extraneous information reaching the jury, and so I don't know that the district court needed to consider the effect of a statement that didn't reach the jury in this, in this analysis. I mean that, that might be an issue for later if they want to, if they want to at some point challenge the evidentiary decision not to let that statement in. What happened here? Can I just ask a factual question? Like, I'm perplexed that this went back to the jury. Like, I went and read the hearings and the court clearly asked counsel to make sure. I mean, why isn't this invited error by, I guess, everyone? Well, I don't know that it's, Your Honor, I don't know that it's in the record exactly what happened, but I mean, I can tell the court what I surmise happened. I mean, I read that, what, the 14-page hearing where he lays out what he told counsel to do. And so, I mean, like, it seems to, what I always did when I was a district judge is you'd have counsel do exactly that, and then you'd go through the exhibits with them and say this is admitted, this is admitted, this is admitted. He didn't do that second part, but he clearly did the first part. Why is it an incumbent upon counsel at that point? Your Honor, to be candid, I don't know if it's in the record what happened with the exhibits between when counsel looked at them and when they got to the jury room. I don't, I'm not sure if it's been established whether perhaps a court personnel picked up the wrong thing. Okay. So we've not argued it's invited error. But you would, the government would have been part of the people complicit in an invited error, right? I mean, everybody looked at these. Everybody was there. Correct. Everybody looked at the exhibits. That's right. That's right. I think, I think the record is clear on that. Related to the judicial economy point, I did just want to note for the court that we're now two years after the jury returned its verdict in this case. This is a case with two murders, two victims, victims' families, and so we do think it would be beneficial to achieve some finality on this issue. Are the defendants incarcerated? Yes, I believe they're all in, they're all in custody. Interim? This is a really interesting point, I think, about the judicial economy, and I'm struggling with, you know, do we have authority to say something like, well, in a typical situation, we'd remand this, but because it's been two years since the trial, we just need to go ahead and get this done. Is there authority for us if we wanted to go down that path? I would point the court to United States v. Hastings, which is a 1983 Supreme Court decision we cited in our opening brief, and Hastings, it doesn't include really a standard for how the court should exercise its discretion here, but it's clear that, it makes clear that appellate courts do have, do have this authority, and you can exercise it. I don't know that there's, there are factors to consider, but I would argue that the fact that we are two years down the road, and we've spent all this time on this issue, is a reason for this court to to pretermine further litigation on it. If we were to find that the error was harmless, or the errors were harmless, there were, there are other things that should be happening, correct? Exactly, yeah, there have not been other, other, the defendants haven't filed any other post-trial motions. The district court put those off until this was dealt with, so it would go back down, they would follow their normal, whatever post-trial motions they intend to file, and then we'd have sentencing proceedings, so there will still be some period of time between, between this court's decision and a final, you know, a final sentencing, regardless. In terms... Your point is, if he finds it harmful, then you're back up here. They're sitting in jail three to four years, potentially. Potentially. Before they even get to post-trial motions. Potentially. In terms of the, the other, the other evidence of guilt, I mentioned Government's Exhibit 120, that's the recorded statement with, with Mond. I also wanted to flag for the court, obviously, Government's Exhibit 131 is the recorded conversation with Brockway. This court already, has already requested that, and has that. And then there's another recorded conversation with Carey, that's Exhibit 125. And it's, it's similar to the Brockway conversation, in that both 125 and 131 include recorded conversations between Carey and Brockway, respectively, and cooperating government witness David Conaway, in which they both discuss potentially joining a future fictional murder-for-hire plot, and discuss information related to these crimes. So if the court were to listen to those three recordings, it's less than an hour in total to listen to them. I think that goes a long way toward eliminating any, any reasonable doubt about the effect of, of these statements. If the court doesn't have any other questions at this time, I will, I'll yield the balance. Thank you. Thank you. Good morning, and may it please the court. I'd like to do three things. If the first is to discuss a through line, and perhaps some distinctions between misconduct cases, which, as the government talks about, are the bulk of rumor cases, where there's already a prophylactic and a backfire effect. The person knows it's wrong. Or they ask for a curative instruction. Versus this kind of weird, unusual case that comes from the court itself, where it's not just Carey three, but a dozen different exhibits with no rhyme or reason as to, to, because of just error of the, of the offers of proof being given to the jury of the unadmitted exhibits. But why isn't the error as much on you as the court? In other words, you all had the opportunity. We don't know how the exhibits got back there. Believe me, getting the call, getting the one sentence order from the district judge saying you will all appear and tell me what you did after that was exactly why he examined us. And I think his conclusion was, this was my clerk's internal error. Had nothing to do with the lawyers. Can I ask you a second question? How do you deal with Walker and Cooper? So in Walker, both published Sixth Circuit cases, videotaped testimony and transcripts went back. And then in Cooper, the U.S. attorney's notes went back. I love, okay, so let's start with Walker. There's 12 cases, and here's, I think, the distinction. Walker and Ewing, so highlight transcripts still lead to a curative instruction in Walker. They tell the court. He cures it, right? In Ewing, there's the internet research, and the judge, I think Judge Ward dissents, but in that regard, there's still harm. In all the 12 cases where the jury is exposed to facts that were not in the trial, there is relief, either by new trial or remand for a memory hearing. There are four exceptions the government cites. I'm sorry, go ahead. It's funny you knew I was going to ask a question. So, I mean, the issues where I struggle, just to be candid with you, is like Nader. I mean, Nader is an incredible case from the Supreme Court that says that's not even structural error, where an element of the crime is not submitted, and the court can look beyond trial evidence to determine if a jury would convict them beyond a reasonable doubt. Coerced confession, not structural error, right? That's Arizona v. Fulmonte. So, I mean, how do you deal with all these cases? The only cases that are structural error, when the Supreme Court says not quantifiable, as your friend on the other side said, it seems like what that is is beyond the trial process itself. Two parts to that answer. First, Scalia hated Nader. I mean, his dissent is so good. I understand, but it's not the law we're bound by. But it's the law in Gonzales-Lopez. And honestly, as a criminal defense lawyer, it's a bit... There are cases Johnny Cochran can't win, and yet Gonzales-Lopez suggests that somehow the choice of your lawyer is so structural. And I think in our situation here, the fact that I don't have any assurance as to exhibits that are in or not in go back to the jury. But we all know that if the Sixth Amendment meant anything, it means you get to pick your lawyer. And so I think that's a different concern, right? That is at the heart of something we can't quantify. Like, we can't... Maybe you're right. Maybe Johnny Cochran couldn't win a case, but he won the O.J. Simpson case, which maybe many people couldn't win. So it does matter. It does. But like in Waller v. Georgia, it's hard for me to see not having the public in one part of Vordaer affects the entire process. As compared to here, I think our complaint is that when the rules of evidence that we spend so much time having offers of proof, having limiting instructions, when all of that has no bearing to what the jury actually gets, it wasn't just carry three. That's what I think he struggled with. This error just affected all of the exhibits, all of the parties. I don't understand why it isn't quantifiable and why it wasn't harmless. I don't think he did us any favors in that order by focusing structural error on carry three, because it hurts the categorical argument, I think, that Scalia talks about. I will tell you, I think the reason why is there's about 35 pages where we are all fighting. So the first thing we know is this July meeting is a late disclosure. The reason that's important and prejudicial is because the guy that debriefed with the government ten times doesn't tell the government. So Mond and the government going into trial have no idea that these three guys have a separate conspiracy, and that's what Mond's defense was, is that he was duped and he was extorted. Then the government chooses not to introduce that. They're like, well, we're not going to bring the statements out. And it wasn't just a statement saying no one cares. It was these are low-life criminals, and no one is going to find them or ask about them. And that was Mond's theory. It's not just callousness, but that this guy wanted to kill and impress others. You're talking about carry. Carry, yes, sir. But that goes back. Why doesn't that help Mond? Well, that's why Mond wanted it in, and that's why. Then why are you complaining that it came in mistakenly? We didn't get that in, Your Honor. We didn't get that statement in. That was going to be conditionally admitted that the court did this balance. But I thought no one cares about these guys was the other statement. No, that didn't come in. That was going to come in if carry three came in. No, I thought it went back. I understand. No, it didn't come back. It was just going to be testimony from Paulette. Paulette, the court wouldn't let us go through the hearsay for Bruton concerns of what was said in that meeting. But the statement we know the jury heard is carry wasn't a part of this. That's right. Two different ones. Carry didn't know anything about this out of context in a transcript. So there's two reasons it was important. Number one, it was taken out of context. Number two, it was this transcript. It was the only transcript they saw. And as to all of your questions, this is why I think the district court is the appropriate place on remand. Oh, okay. Let me like move on to that. But I just want to understand this. I'm sorry. So statement A comes in. Why isn't it quantifiable? Because like the government points out in Delaware v. Van Arnstiel, in all kinds of cases, courts look at the other evidence and say, okay, if all this is in, let me look at the evidence as a whole. Would it be harmless beyond a reasonable doubt? I'll tell you for a few reasons. First, because it was subject to a motion in limine. It changed our openings. At that point, we weren't able to talk about that. It changed our crosses of Somme. It changed the cross of Paulette. You can say that about every one of these cases that the Supreme Court lets be analyzed under that rubric. Yes, sir. And I think with instructions. You're right. Because when district courts make evidentiary errors in whether they let in stuff or not, on appeal, we often say, well, it was a mistake, the evidentiary ruling, but it was harmless error. And so to me, you really have to convince us that this is harmful in some significant way. Well, I will tell you, when we look at the dozen of cases where facts are going back to the jury, there's only four where relief is not granted once a prejudice determination is made. In Lartigue, the shoe was already in evidence in the suitcase. I think in the – But you're basically conceding – No, go ahead. We can look at these cases, but you're conceding that none of those courts treated it like structural error. Oh, yes, without a doubt. You're right. No binding authority out there that says – No, I just – but it's just – this is a weird case. It's not – all these cases involve one piece of evidence or a book. This affected all of the exhibits, not just the one prejudicial one. To your question as to why it's prejudicial, first, it wasn't in the courtroom. So that statement goes back to the jury without context, cross-examination, or any of the information that we were already telling the judge that we were going to introduce should that statement come in. That's my point. Once we know that, then we can look at it. You're right, and I think when we look at harmless error in the Remmer context, what we believe, that the cases from Nevers to Remmers II, the remand on Remmers, doesn't focus on what's all the evidence at trial, which is what the government says. It focuses on that extraneous, unadjudicated fact. Remmer II says – both of those, Remmer I and Remmer II, I thought, used the language of harmlessness. As to the piece of evidence, as to the fact that the jury didn't say yes, I think the government is saying we don't need to look at that. We can look at the totality, and I don't think the government has a single case that after that unauthorized exhibit goes back, the government doesn't have a single authority that says if we've looked at it, the jury's considered it, and we find that piece of evidence to be prejudicial in some way, then it doesn't matter. I think it's that second step. Wait, but Smith says that, basically. I don't – no, I don't think Smith says that. Okay. Go ahead. Sorry. I'm just blowing it up while you talk. Okay, please do. I'm sorry. I'm sorry, Gerard says a question. Counsel, on the point of, you know, do we send it back or not, I just want you to respond to this notion of judicial economy. You know, here we are two more years. We haven't been sent – I mean, there are so many things the district court still is doing, and I think that because of this – But they're all on hold, right? We're all on hold. And you would concede it's the same record, whether we look at it – It's the same record, but he knew the significance of these statements in a way, because we had argued about them so much. And so I would say that that's why we need him. And also, under Rule 33, he has the ability to grant a new trial for manifest – I mean, he has a separate ability, and he gets the chance to both explain how it's harmful and, under Rule 33, address whether a new trial is warranted. Your red light is on, and I know you have colleagues. Thank you very much. I'm sorry that I didn't get to finish your question. No, you were fine. Thank you. Good morning. May it please the Court. Luke Evans on behalf of Brian Brockway. The Court has heard lengthy arguments from my colleagues this morning. As to Mr. Brockway, based on the Court's questions thus far, I think it's important for us to look at the direct effect to Mr. Brockway and how it's distinguished from the prejudicial effects or potential prejudicial effects of Kerry or Mond. The error that occurred was specific to Brockway in a way that it was actual prejudice. And the Court referenced the Sixth Amendment earlier, and his right to confrontation was affected directly. And you can see that in the record because the Court, as we're going through the arguments about the admissibility of the July 20 lunch meeting where Kerry says what he says about no one cares about these people, versus the other statement of Adam doesn't know anything. Who made the Adam doesn't know anything? I thought it was Mr. Brockway. That was my client. And my position in trial was, yeah, that can come in. I didn't object, but that's opening the door. Well, that's why Kerry didn't introduce it. Right, and that's why Kerry didn't introduce it. But the Court found it so significant at the time about the inconsistent defenses because Mr. Kerry, I think in Vordaer, started laying the foundation for hapless Rube, Brockway made me do it, and then that persisted throughout the case. And when this issue happened, the Court changed the entire order of proof so that my client would be able to recall Pallette. So the Court said, look, I'm not letting this back. And I argued, well, he's laying the groundwork that my client's more, that my client, he's a hapless Rube. And the Court said, well, here's what I'm going to do. If he opens the door by putting in any statement, including that Adam doesn't know anything about this statement, you'll be able to go last, you'll be able to recall Gil Pallette, and you will be able to get into the July 2020 lunch meeting statement. And Mr. Brockway was deprived entirely of the ability to do that. And I think that's where… What case do you have that stands for the proposition that your own statement, you are entitled to confrontation clause rights? That's where I would struggle. And with candor to the Court, I don't have a case to point to. You see what I'm saying? I do. There's no that I can think of. Now, maybe you have some. You don't, but it could be a needle in a haystack. Right. And I don't. And I think this goes back to what Mr. Gonzalez was saying earlier. There had been redacted recordings already agreed to by the parties prior to the trial that did not include that statement. The government had said they weren't putting that statement in. We had agreed to work through some of those motions and evidentiary issues early to see what we'd be litigating on what comes in and what doesn't. So my entire trial strategy was built on the fact that that statement wasn't coming in. I mean, from opening to… But we know what you would have done. So are you saying it was harmful or are you saying it was structural? Well, I'm saying it was structural and harmful. I'm saying that Mr. Brockway… You're saying, give me structural, but if not, give me harmful. Yes. Okay. So as part of the harmfulness, you're saying your strategy would have been different. Absolutely. What would you have done differently? Well, I mean, I would have front-loaded that statement. I would have provided context for that statement because that statement is completely out of context. That bare statement in and of itself… Isn't there tons of evidence against your client apart from that? Oh, there is overwhelming evidence surrounding the occurrence, but not what happened. My client made statements, some very bad statements, to Mr. Conaway, who was wired, after the fact. But as far as what happened in the moment between what Kerry did specifically, what he did specifically, and part of our defense was that my client was not being honest when he gave the statements to Conaway, who was another coworker with the CIA in doing these jobs and was actually on the ground for part of this job. But what about 131, the recorded conversation where Brockway is discussing the murders? I know, and that's exactly what I'm saying. And our position, our argument was, I mean, good or bad, right, was sometimes people tell lies to get more work or to make themselves look… And you were able to make these arguments. I was able to make those arguments, but what I wasn't able to do, though, that goes to the overwhelming, what the government wants to talk about and the court's talking about, this overwhelming proof, right? But I wasn't able to make the argument about Mr. Kerry specifically and his role more full-throatedly because that statement… From July 2020 didn't come in. That didn't come in. And saying, letting in an out-of-context statement about… I mean, right, tell me how, I'm still lost as, okay, I get it, Kerry was callous, right, in this statement. But how does that relate to the fact that your bank records, your email records, your car records, the video, the video outside her apartment, all of that collectively plus his admission, I mean, it's one thing to boast about something. It's another to have all this circumstantial evidence plus boasting about the murders. So – and just to be clear in my recollection of the record was they did not have phone records for Mr. Brockway. No, I didn't say phone. I mean bank, email, hotel, Hertz rental. They had hotel and rental, no bank records for Mr. Brockway. Okay. And so – and that's the other thing. There's no indication in the record that Mr. Brockway financially benefited from this. There's no corroborating evidence. But Mr. Kerry, when they search his house, has a large amount of cash in his house. Just kind of stepping back, I'm going to ask you the same question. I think I've asked the other counsel about why would – you know, for efficiency's sake, why can't we just look at this universe of facts and we know exactly what would have happened if this had come out properly during trial, this other July 2020 statement. We know exactly what the path not taken looked like, and so why shouldn't we make this prejudice determination in the first instance as opposed to remanding? Well, I think as far as Mr. Brockway is concerned, I think the issue that I struggle with is – it is essentially this idea of the court being, and why it's structural and unquantifiable, is the question becomes what is – we can't quantify what the jury would have done had I been able to explore the proof as I wanted to. Isn't that going to be true then in any case, that we can't tell what the jury would have done? Well, yes, but the distinction here is if you're looking at a record where only admitted exhibits went back to the jury, right, and there wasn't something held back by the court like a right – you know, my right to go last in the order of proof to rebut the opening of the door by the entry of the exhibit that Kerry put forward that got mistakenly or inadvertently taken to the jury. That's a different thing because that – I think that solidifies Mr. Brockway's position in a place where the court recognized it, changed the order of proof to allow me to confront that if he opened the door, and then the door comes open inadvertently, and my client was sitting ready, and I think the court can read the record absolutely and see. Here, you can see this is what we would have went after. This is some of the stuff we would have cross-examined Gil Paulette about. We would have been able to provide context to that whole conversation about Adam not knowing anything about what was going on. But as to this court versus the district court, the one thing that Mr. Gonzalez hit on and the court talked about is judicial economy on this. The one part that if it's – if this court doesn't remand and addresses it and sends it back and says it's harmless error, then as Mr. Gonzalez pointed out, we still have to argue the remainder of the post-trial motions. That is true no matter what. Unless the district judge says it's harmful error, then we have to review that on appeal. We could reverse that.  And so if the court was inclined to remand instead of address the issue and do what I'm asking the court to do, as to Mr. Brockway had found it, that it is structural error, and if not structural, not harmless error, and therefore he gets a new trial, I do think the best place for it to be litigated would be to be remanded back to the court. Do you still seek a new trial on other grounds if we were to say this was harmless error? Yes. And then the court – That could be one of your post-trial motions. Absolutely. Your red light is on now, too. Thank you. I appreciate the court's time. Good morning, Your Honors. Benjamin Perry on behalf of appellee Adam Carey, if it may please the court. Obviously, there's been excellent argument by the parties as far as structural error. Mr. Carey's position would be that this is absolutely structural error. I believe that the court has pointed out and the government began its argument with saying Mr. Carey got exactly what he wanted. And didn't he get what he wanted? He wanted that statement to come in without other people being able to challenge it. I would disagree with that position. Okay, tell me why. I think everything has to be in context, and that's the overarching theme as far as Mr. Carey is concerned. You know, this was a joint trial. As has been briefed, Mr. Carey sought severance on multiple occasions. There was motions in Lemony. The trial court presided over that, made evidentiary rulings. These specific exhibits that the government references. But if he was tried alone, let's say he got that, he would have put this statement in, there's no doubt. It was your exhibit, and the reason you didn't put it in is because what they were going to do to Carey with the other statements. I disagree with that, Your Honor, because Exhibit 131 only came into Mr. Carey's trial because it was a joint trial. It had been redacted to remove the part that said Adam didn't know anything about it because of brutal issues. If Mr. Carey had been at trial alone, Exhibit 131 would not have been elicited. How is that a brutal issue? It's definitely not a brutal issue as to your client. Well, it names him. It's the only statement that names the co-defendant, and it's a testimonial, confessional, out-of-court statement by a non-testifying co-defendant. But it's not brutal as to your client, right? He names my client. By simply naming him, it doesn't make it brutal. It has to have some incriminating nature. Well, it's in the context of Exhibit 131 as a whole. Which says that your client doesn't know anything about this. Exhibit 131 as a whole, Your Honor, I believe, and it's been a while since I've listened to it, I'll concede that. Mr. Brockaway talks about all the things that were done and the steps were done and we did this and we did that, and then the part that was excised was making Adam the we in all of that. And so by putting that in with no context for the jury, with no argument whatsoever, it completely makes everything else directly tied to Mr. Carey. If it is a brutal error, then it's clear that the harmlessness inquiry applies, right? We know that brutal errors are not structural. Well, Your Honor, there's kind of a confluence of multiple different facets here. There's a lot of equivocating in the brief, so I'll give you all that. But if it's a brutal error and we look at harmlessness, I think we're back to what Judge Moore's initial question was, is how is this harmful to Mr. Carey? Well, it's harmful going back to the context thing. There was no context. The exhibits at issue were made during an offer of proof to try to preserve the record because of the court's pretrial rulings, because of its during trial rulings, because of Mr. Carey's position that he shouldn't have been there. Exhibit 131, he specifically sought to exclude in its entirety, and in that case, the excerpts, there would not have been an offer of proof. Mr. Carey would not have put those exhibits in at his own trial. And the same for Exhibit 120 that the government referenced, the conversation between Mr. Mond and Mr. Poled, that would not have come in at Mr. Carey's own trial. The only reason it came in is because the government decided to try all three of these individuals together. So all of that goes to whether you should have been severed from the other two, right? Correct, but that goes to the context of why this offer of proof was made, was to preserve that record. This was not something that necessarily was ever intended, Mr. Carey, to go to the jury, and particularly not without context or argument or cross-examination, being able to tie that statement back into other witnesses' statements or other proof in the case to support a position. It just went back to the jury cold with no explanation for any of the defendants in particular. It seems to me that you have such a hard role here because the statement that you're objecting to is, Adam didn't know any of this shit. And that seems so favorable to your client to come in. It could be. It was a mistake. The district judge had ruled against it coming in. But it seems awfully hard to argue that that's not harmless error. It is difficult, Your Honor. I will concede that. However, again, going back to the context of everything, the statement came in. It does name him implicitly in the overall Exhibit 131, which is essentially a confession by Mr. Brockaway implicating Mr. Carey. Now, again, the intent was never for that to go back to the jury, and certainly if it had gone back to the jury, Mr. Carey's defense would have been altered to some extent at least. It would have been able to argue. It would have been able to explain it, been able to ask the witness that it would have been put in through, more of the context about that and to further probe that, to further present his defense in this case. The government likes to say that there's overwhelming evidence. If the court looks at its citations as to Mr. Carey, the government, as it's wont to do, and makes these broad assertions about Mr. Carey, but when the court actually looks at the exhibits and its citations to the record, they don't exist. They're misleading at best. Well, he's definitely on video outside her apartment. He is, Your Honor, but he's on video before anything happens, as are the two of the cooperating witnesses in this case. And had we known that that was going in, had Mr. Carey known that it was going in, that argument could have been made to the jury, and not being able to make that is prejudicial to his overall defense. But that's like, okay, we got the evidence we wanted. We just didn't get a chance to make the argument we wanted. Again, Your Honor, it was not attempting to put that in in front of the jury. It was an out-of-jury's-presence offer of proof to preserve the record for potential other issues down the road. So are you arguing that's harmful or structural? I'm arguing it's structural, but if the court disagrees with it— But it later is a way to get to argue about the element at all. I agree with that, Your Honor, but— What about a coerced confession in Fullamonte? Well, Your Honor, I think when we go back to, as my colleagues have argued, the fundamental structure of the trial is that— No, but your point is we didn't get to make this argument. Like, the statement, okay, I concede— I mean, maybe you don't concede it's a great statement for your client in spite of what it says. But the statement, okay, we didn't get to make an argument that's structural. And my point is, how can that be structural? Nader and Fullamonte and every Remmer case coming out of the Supreme Court is not structural. Right, Your Honor. My position would be that the exhibit, which had been specifically— Cary 3 had been specifically redacted by the court from Exhibit 131 because of a potential brutal issue, because it was a part of the long Exhibit 131. So Cary 3, that recording was extracted from that. That was done by the court prior to trial to avoid any issues. But I thought—correct me if I'm wrong— I thought you affirmatively wanted to bring it in initially, but then the other defendant said, and if you open the door, we're going to slam it in your face with these other statements. Correct, Your Honor. I did probe that. I mean, I did bring that up during trial. And obviously, as the court can see from the record, this was a convoluted, multi-defendant trial, getting back to the severance issues that are aplenty in this case. But the fact is, is that it did go back. Can you, on a motion for new trial, argue about the severance issue and say, by not severing it was prejudicial, thus you should grant me a new trial? Absolutely. I mean, I think the court in the record said that the issue was so well-preserved, it's pickled. And on the severance issue, because there hasn't been an appeal by the defendants of the conviction and sentencing down the road, severance would be able to be raised later on too, right? It is—yes, ma'am, Your Honor. It is able to be raised in the standard course of what would be post-trial motions at this point. Unless the court has any other questions. Thank you. Rebuttal. Thank you, Your Honor. I want to respond first to a few things that Mr. Carey's attorney just said. First, he says that the government's citations to the record are misleading with regard to the proof against him. I would just urge the court to, in particular, look at page ID number 4003 and number 4019. And on both of those pages, David Conaway testifies about statements that Carey made to him that were not recorded, but he testifies that Carey had told him that he would take care of this for $50,000 or $60,000. That's before the murders. And then after, on page ID 4019, Conaway testifies that Carey said that they went with the $60,000 option. And then if the court looks at page ID 4109-14, clearly Mr. Carey was trying to get Exhibits 3 and 4 in. I don't think there's any doubt about that if the court looks at the record. There's not been a lot of discussion today about Gilad Poled's testimony, but Gilad Poled was kind of at the center of this conspiracy, and he provided extensive, extensive testimony at trial about how all of this worked. So that is corroborating everything else, all the other evidence in this trial. And then I think in terms of how the harmlessness analysis should work here, the court should look at both the statements and the overall evidence. And if the court looks at the statements, the first statement that the jury did hear, Adam didn't know any of this stuff, the specific context of that statement is that Mr. Carey didn't know any of this stuff about the value of being mobile as opposed to static while carrying out a hit. The context is not Mr. Carey didn't know anything about what was going on in this case. And just to respond to some suggestion that Exhibit 131, that referencing Adam in Exhibit 131 might have been prejudicial to Mr. Carey, Mr. Carey, from opening statements to closing statements in this trial, didn't dispute that he was present when these murders happened. His theory at trial was that he had been there and Brockway had done them, and he was kind of shocked by the whole thing. So in that context, just mentioning his name, the jury was already easily able to infer that he was the other person. Mentioning his name didn't, that's why he wanted it in. Going back to the statement the jury did hear, Adam didn't know any of this stuff. Is it stuff or shit? I'm using the non. You're being polite. I'm being polite, Your Honor. I just wanted to be accurate. It is shit in the actual statement. You have to look at the, Maund and Brockway, look at their role in the conspiracy to figure out what the effect of that statement was. Maund was back in Texas. He's communicating with Paulette only. He's not communicating with Brockway or with Carey on the ground in Nashville. And so the relative knowledge of how to, you know, whether it's good to be mobile or not while carrying out a hit on the ground in Nashville, that doesn't affect Maund's guilt in this case at all. Whether Maund knew about this conspiracy and joined it is not affected by that statement. And then as to Brockway, as the court has discussed, on Exhibit 131 previously in that conversation, Mr. Brockway is describing how these murders were carried out. And so then to have the additional statement that Adam didn't know any of this shit is just, it doesn't move the needle. And then the other statement that the jury didn't hear, no one cares about those two people, as I've already explained. Maund and Brockway were fully able to argue their theory to the jury that Carey was a loose cannon and he went off and did this on his own. Whether people cared about the victims or not, it just doesn't, again, it doesn't move the needle on their theories of the case. And so for all those reasons, the net effect of these two statements was harmless, beyond a reasonable doubt, and we would ask the court to say that and reverse the district court's order granting a new trial. Thank you. Thank you. Thank you all for your argument, and I understand that Mr. Evans and Mr. Perry are appointed pursuant to the Criminal Justice Act, and we want to thank you for your service to your client and to the justice system. And the court will be looking into this case, and the case will be submitted.